My name is Philip Black with Wolf-Popper LLP on behalf of the Plaintiff Appellant Theda Jackson-Mau. I want to thank the Court for the opportunity to appear here today. This is a case about the mislabeling of a dietary supplement. The defendant's dietary supplement says on the front label that it's glucosamine sulfate. On the back, it specifies that it's glucosamine sulfate potassium chloride. The problem is that's not the chemical that's actually in the bottle. What's actually in the bottle is glucosamine hydrochloride and potassium sulfate. It's a materially different blend of chemicals than what's on the label for two important reasons. The first is that glucosamine hydrochloride is considered to be an inferior form of glucosamine. We know this from the federal government's National Institute of Health Medline Plus web page says that, Mayo Clinic's web page says that, WebMD says that, which is relevant. I guess all of that may be true, but maybe the question is who, you know, why do we decide that and why is this not preempted by, you know, the federal law on this? Sure, Your Honor. So the district court here held that because this blend of the wrong chemicals will pass the United States Pharmacopeia or USP test for glucosamine sulfate potassium chloride, that means this claim is preempted because the FDA purportedly defers to USP. The problem is that that's not correct. The FDA does not defer to USP when it comes to dietary supplements. And that's clear if you look at the regulations. The regulations pertaining to what goes on the front of the label do not mention any testing regimen whatsoever. The regulations that go to the supplement facts panel mention using tests that are reliable and appropriate. And if you also look at the good manufacturing practice regulations, those say you have to pick a test that's valid, you have to pick a test that's fit for purpose, and it's up to the manufacturer to select a test that is fit for purpose. Here, the reason that the distinction between the forms of glucosamine and also the addition of potassium sulfate, which is fertilizer, is important for the case is that the manufacturer needs to select a test that can distinguish between the two forms of glucosamine. The USP test cannot distinguish between the forms of glucosamine. That's why it's an inappropriate test here. And it's not a required test, and it's not a test that the manufacturer can just do and say, well, it passes USP so we can sell it. Sotomayor Well, maybe if it can't distinguish between the two, it means that it doesn't matter what the difference is, right? Goldstein It does matter what the difference is. All the experts in this case agree that the chemicals are different. And again, the Medline Plus from the National Institute of Health, Mayo Clinic, these clearly say there's glucosamine hydrochloride, there's glucosamine sulfate. Mayo Clinic specifically says they are not considered interchangeable. They're different chemicals. They're not considered interchangeable.  Sotomayor Not considered interchangeable for what purpose? For the beneficial effects, if any, that it has? Goldstein Correct. Correct. They're not interchangeable for that purpose. Sotomayor But, I mean, it seems to me that the FDA regs suggest that supplements like this should be declared by their common or usual name, right? And you're basically saying that that's not true or it's not, we're not following that? Goldstein No. It is true. It should be declared by its common or usual name. If you look at the regulation pertaining to common or usual name for the statement of identity on the front of the panel, that's 21 CFR 102.5, specifically subsection D, says common or usual name should reflect common usage. Again, common usage is that glucosamine hydrochloride, glucosamine sulfate are separate chemicals. They're not interchangeable. You can't have one and call it the other. Also 21 CFR. Sotomayor But, I mean, in the past, the FDA has basically said that you look to the compendiums to decide what's a common or usual name, no? Goldstein That particular section refers to section 403 S2D. That specifically applies only where the dietary supplement says USP on it. So if it said, if glucosamine sulfate USP, then if it doesn't satisfy the USP test, it's mislabeled because it says USP and it doesn't satisfy USP. But the statute, the FDCA, this is a disjunctive statute about what is misbranding for a dietary supplement. Sotomayor Well, it seems that the FDA has provided guidance on this. Are you saying that that guidance is not binding or it should be ignored, or are you saying that the guidance is being misconstrued by your adversary? Goldstein The guidance is being misconstrued. And we can show pretty clearly that the guidance is being misconstrued by asking USP. What does USP think its role is here? And so I'm going to read from the USP's website, this is cited in our opening brief starting at page 11, it's cited elsewhere in the brief as well. This is what USP says. The existence of a monograph. A monograph is the USP's dietary supplement test, basically. It's called a monograph. The existence of a monograph or a dietary supplement does not provide independent evidence that a particular product may be lawfully marketed in the United States under the Food, Drug, and Cosmetic Act and its implementing regulations. It is the ultimate responsibility of dietary supplement manufacturers and distributors to ensure that their products are legally marketed in the United States. So to the extent there's any confusion, which we submit that there isn't if you read the USP says, you can't just use our tests and put your product on the shelf and rely on them as not being mislabeled. That's from USP itself. So because the FDA does not defer to USP, Plankett's claims are not preempted. The FDA regulations specify no test whatsoever for what needs to show on the front of the label and it, as for the back of the label, it just says a reliable and appropriate test. If you look at the other regulations, it says the test must be fit for purpose. Here, the test used by Plankett's experts were fit for purpose because they could distinguish between glucosamine hydrochloride and glucosamine sulfate. USP cannot, AOAC test cannot, defendants' experts do not dispute that they can't make the distinction that's relevant to the mislabeling being alleged here. And I just, in my time that's left, I want to address the issue of injury, which was the other reason that the court granted summary judgment here. Again, the difference between what the label says is in the bottle, chemically, and what's actually in the bottle is a material difference. It's the wrong form of glucosamine, the form that's perceived to be ineffective. It also contains potassium sulfate, which is fertilizer. We know this because if you look at, just look it up in Webster's Dictionary. It says potassium sulfate, K2SO4, used especially as a fertilizer, that's confirmed when you look at pump chem. It's not sold as a dietary supplement, potassium sulfate. That's not disputed. So what the Plankett thought was something that she thought contained an efficacious form of glucosamine, what it actually contained was the wrong form of glucosamine blended with fertilizer. But it seems to me you're really taking issue with the USP, right? We are taking issue with the USP test in this case. But it's not clear to me why you get to do that. I mean, it seems to me, isn't that, hasn't the FDA recognized that that's, you know, one of the handful of officially recognized compendiums that are relevant to ascertaining whether some, whether that's the common or usual name? It is not the lodestar for common or usual name. Again, that's in 21 CFR 102.5, which points to common usage. Again, USP on its website says, just passing our test does not show that your product is labeled correctly. And I would just point the court to the regulations that talk about what test is supposed to be used to confirm what's in the bottle. 21 CFR 1019G2, and then in the Federal Register, in the Good Manufacturing Practice commentary that's stated in the briefs, the FDA was very clear. They were asked, actually, by industry in the comments, will you designate USP as a presumptively valid compendial method? And the FDA said, no, we will not do that. It's up to the manufacturer to pick a test that is appropriate under the circumstances. We decline to designate USP to develop official standards for dietary supplements. So just to close, if I may, I know I'm a little over time on the issue of injury. Again, the plaintiff bought something that she thought was one chemical. It was a different chemical blended with fertilizer. And there is no market for that blend of chemicals. The comparator is zero. You can't find potassium sulfate as a dietary supplement. You can't find glucosamine sulfate blended with potassium sulfate. She bought something that was worthless. You can't buy it. And it's clear under the Second Circuit's law, under GBL 349, if you buy a product and you don't get the full value of your purchase, you have shown injury. That's conclusive under Orlander v. Staples. But what you're basically saying, worthless, I mean, you're sort of throwing those terms around, but it's not clear to me. Why is one worthless and the other not? So glucosamine sulfate is the desirable form. Well, desirable. Because it's considered to be efficacious. You can't buy potassium sulfate as a dietary supplement. You can only buy it as fertilizer. You can buy it at Home Depot. You can't buy it at Walgreens, right? To have that in a dietary supplement is not something you can't even buy. It's not on the market. It's not worth anything. Well, I guess I'm not sure that I'm following what you're saying. I mean, it seems to me the supplement that is being purchased, right, you're saying it's mislabeled, but it's not clear to me why you're saying it's worthless. Well, I just, I'll distinguish it from, say, a case where you have, like, a flushable wipe, say, right? You can buy a flushable wipe, but you can also just buy a wipe, right? And so you can ascertain what's the worth of it being flushable versus not. Here we have a case where the supplement says that it's one thing. That substance is entirely absent from the product. There's no glucosamine sulfate in it at all. Instead, it's got a chemical that the consumer doesn't want blended with a chemical that the consumer What you're basically saying is that the consumer doesn't want it, or that the consumer is making these distinctions. I mean, my sense is we haven't really gotten there yet, but you're announcing this kind of broad proposition. I'm not sure what the basis for it. Well, I'm just saying that there is evidence that should preclude summary judgment on not showing injury in this case. There is evidence that this product is not for sale. That's evidence that it's worthless. The evidence that it contains fertilizer, that's evidence that it's worthless as a dietary supplement. All right. Well, we'll now hear from your adversaries. Thank you, Your Honor. Mr. Andre. Thank you, Judge Sullivan and members of the Court. I'm John Clondon, on behalf of the defendants. I guess I, of course, disagree with my opponent that the FDA doesn't defer to, hasn't incorporated the compendial methods that we've discussed in our brief. Congress, of course, referenced the compendial methods back over 120 years ago. They specifically, in Section 343S2D and E, referenced the official compendia. The FDA in 101.9G2 expressly adopted the AOAC methods. And in addition — Well, there's no one that's the authoritative, right? That's correct. I would say, though, if you were going to look at them, the FDA has spoken to the AOAC the most, and then secondarily, the USP, and tertiarily, another one that's not at issue in this case, and then the EEP would be kind of under a catch-all. But, I mean, the statements from the FDA that you look to with these compendial sources when determining the identity and the quantity of a product are legion. And most critically, I think, is the one from just four years ago, the 2020 Compliance Manual. There, it said composite methods in AOAC, USP must take precedence over other methods. And I realize there's some tension there between the caveat that the FDA has also given some time, saying so long as it is available and appropriate. But, I mean, as recently as four years ago, the FDA was very strong that that is where you look. And that is where we looked here and where plaintiff's experts did not look. And for that reason, the district court correctly found plaintiff's claims preemptive, right? I mean, Dr. Spingarn, plaintiff's own expert, admitted that the sample he tested of our product matched the USP monograph. That's at 121, 122 of the joint appendix. He also admitted that it matches the EEP's, sorry, European Pharmacopeia's certified reference standard. That's at 1383 of the record. And so right there, when their own expert says, you know, applying my tests, I agree that the product matches these things that the FDA says are, you know, the gold standard. Then game over. That's as far as we really need to go. Of course, there's an additional layer if the Court wants to go there, and that's to actually look at what Spingarn did. Because when Mr. Black said that, you know, his experts performed reliable alternative tests, they are not reliable alternative tests that Dr. Spingarn performed here. First and foremost, you know, back with the Hollins litigation, he hadn't validated his tests at all. Here in this case, after doing the very testing at issue, he post hoc validated it, and our expert testified that that was insufficient. But it's insufficient even if you go beyond the timing, because he didn't use any of the methods, many of the methods that you're supposed to do to validate a test. Validation, of course, means that you're validating a test for the purpose for which it is intended, and it's based on accuracy, precision, specificity, detection limit, and quantitation limit. I understood your answer to say that the FDA does not defer to the USP test when it comes to dietary supplements. I mean, I think the FDA is very clear. I mean, again, just for... It's very clear, like where is it? 2020 Compliance Manual, that's our shorthand for it, but it's cited throughout our brief. I think we cite it four or five times, and I believe it's on page 25. I don't have it in my notes. It says composite methods in AOAC, USP, et cetera, must take precedence over other methods. That's the most recent statement, but... Dietary supplements, this is what we're talking about, right? Correct. So you're asking if that applies to... I know that's what you're talking about. The question is, is that what the FDA is talking about there? Yeah. They're talking about all foods, and dietary supplements are one of them. But the FDA, again, I think has been repeatedly expressive in saying that you look to this kind of source... So it refers to dietary supplements because dietary supplements are food, and this refers to foods. Yes. Yes. In addition, though, I want to focus on the fact that Mr. Black has said that there's this exception for, you know, so long as the AOAC, USP, other compendium method is applicable and appropriate. And if it's not, then they can bring in their own exception, their own testing. Here, the FDA has told us what applicable and appropriate means. In footnote 12 of our brief, we actually cite three FEDREG documents, and the middle one, the one from 2014, that's 79 FEDREG 11956, it lists what or when AOAC methods are not available and appropriate. And it lists six items, added sugars, three different kinds of fibers, vitamin E, and folate. And then the FDA goes on to say, you know, if there are others, then contact us and get an exemption, and maybe we'll authorize some other method. But that list, I think, is exhaustive, absent it being expanded in subsequent rulemaking, and it wasn't. In fact, it was reaffirmed in 2016 in the next citation in that footnote for us. And in this case, you know, what's interesting also is that Dr. Spingarn didn't reach out to the FDA, but he did reach out to the European Pharmacopeia and the U.S. Pharmacopeia and complained about the fact that their reference standards and identity standards couldn't distinguish between the single crystal form and the blended form. And, you know, after he got an answer from them... Well, I kind of, I'm sorry to interrupt you, but I mean, it seems to me that what Mr. Black is saying is that there's only a better way to label this product, regardless of what the USP and the EP have done, and that's to use the name he's proposing. I mean, your point is that that's not what the FDA requires. The common name or usage is enough. But the district court noted there are no other standardized or peer-reviewed tests for GSVC. Is that true, and is it still true? Was it true, and is it still true? I'm sorry, are there no other standardized tests? I mean, that's something the district court found, right? There's no other tests of the sort that Mr. Black is saying should have been done here. Correct. Correct. Well, you can conduct a test on anything, but, of course, the very criticism that Mr. Black is levying against the FDA and the compendial methods is also one that can be levied against his experts, because his experts can't detect the difference between glucosamine sulfate potassium chloride and glucosamine sulfate, I'm sorry, glucosamine hydrochloride. And that's, and there's a reason for that, and it's because contrary to all the websites that Mr. Black cited, which are not before it properly before you, you know, the actual scientists that matter, the ones who are consulting with the FDA who created these tests. Remember, the FDA hired AOSAC to create its methods. Those scientists don't believe there's a meaningful distinction between these two substances because once either one hits your tongue and goes into your body, it immediately dissolves into the exact same four ions in the same quantity. And so it doesn't matter. Sotomayor, as you argue, you argue it doesn't matter. Nevertheless, it's a thing that the label calls it glucosamine sulfate, when I don't think you dispute that it's glucosamine hydrochloride. Oh, no, no. We absolutely do dispute that, because what our COA, for a number of reasons. First, our COA showed that what our Chinese manufacturers precipitated was a single salt of glucosamine sulfate. But that's not the way, the basis on which we defended or attacked their attack in district court and we're defending here. Instead, our approach was to say, wait, wait, wait, let's stop you even before you get there. You are proposing alternative testing methods that don't comply with federal standards. And then even if we look at your testing methods, then they're not reliable and appropriate. And so you lose both ways. That's how we chose to defend the case in Holland. That's how we're choosing to defend the case here. But we absolutely dispute that it contains glucosamine sulfate or glucosamine hydrochloride. So it's a single crystal formulation? That is what our experts have testified to. In fact, our experts repeatedly said that that is what happened here. I understand. And your adversary did their own testing, and they concluded that it was unbiased. Correct. Correct. Using testing, again, the FDA hasn't blessed you. Smaller samples and so on. Correct. Correct. If the Court has no further questions, I'm happy to – well, I guess I should address the GBL no-injury point that Mr. Black raised as well, unless the Court wants me to discuss more of the preemption issue. So in this case, plaintiff pleaded a price-premium theory of injury. That's on the Joint Appendix, page 14, the amended complaint. And the New York Court of Appeals has been clear and small. They said, we disagree that a plaintiff can state an injury by saying that they wouldn't have purchased the product and that's all that they're saying. Rather, they must show actual damage from their purchase. So that means separate damages because the product is worthless or separate damages because there's a price deferential. The real problem for plaintiff here is that she didn't retain a damages expert. And so when we pointed that out in our summary judgment papers, then she came back and said, well, you know, we think there's fertilizer and that adulterates the product. I mean, the reality is, is that, you know, fertilizer is commonly used as a food-flavoring agent. And while, you know, they like to talk about it being, you know, poison and toxic and available at Home Depot, the reality is we ingested all the time. I'm sorry. Cass himself said, we ingest it all the time. And so this case is not about fertilizer. That doesn't make the product worthless. And the only evidence that came into the record in the summary judgment phase relating to potential valuation of the two different products was from our expert, Dr. David. And they pointed to in their brief his testimony claiming that he's agreed that the product is worthless. But if you look carefully, again, this is 1308 to 1310 of the Joint Appendix, he was very clear in all of his statements, all four of them, they were conditional. Well, if this hypothetical is true, then the product might be worthless or it could be worthless. He never admitted it was worthless. And so, therefore, there's an entire vacuum of proof with respect to the potential worthlessness of this product. And on that basis, plaintiff, you know, didn't create a material issue of fact. And at least if you get past the preemption issue, which I don't think you should, then at least you should affirm Judge Block on the alternative holding under the — under GBL 349. Thank you, Mr. Hunter. Mr. Black, you have two minutes to rebuttal. Thank you, Your Honors. A few points, starting with where Defense Counsel sort of left off on the fertilizer point and how we ingest it all the time and it's no big deal. If you look at the sources that they use for that in the 56-1 statement, one of them is an NIH website, which, of course, we're relying on statements from the NIH as well. It says it's found in some fruits and vegetables. It doesn't say in what amounts. More notably, in the same response, they cite to the PubChem, the same page that tells you that potassium sulfate is mostly used as fertilizer. If you look at the food additives section of that page, it references a regulation from the FDA that says you can use potassium sulfate in soft drinks. It can't exceed 0.015 percent of the soft drink. Trace amounts of potassium sulfate can be found in things. It's not found in a trace amount here. It's a significant percentage of what's in there is fertilizer. It's not supposed to be that much. That goes to injury. That goes to materiality as well. As to the allegation that it all dissolves in the stomach, again, there have been studies done on this by people who are qualified to do the studies. Those are represented and communicated to consumers. And MedlinePlus from the federal government, Mayo Clinic, says glucosamine sulfate has been shown to be effective. Glucosamine hydrochloride hasn't. Those are the facts. As to the difference between the USP test and the test that Plaintiff's Expert used, again, I need to emphasize, there wasn't any dispute that the USP test can't distinguish between the wrong form of glucosamine in a blend and the right form of glucosamine that's on the label. Right? So when he says our experts think it's a single crystal inside there, they don't say that. Because what they have conceded is that the USP test, which is the only test that was done by the manufacturer, allegedly, can't tell the difference between the two to begin with. So there's no basis to conclude that there's a single crystal in there. No test was done that could confirm that there was a single crystal of glucosamine sulfate inside the bottle. Finally, I would just say, as to counsel's comments about USP taking precedence and being the gold standard and all those things, the facts in this case are, for this compound and these circumstances, it's not a valid test. The FDA does not defer to methods that aren't valid. Frankly, their position doesn't square with what the USP says its role is on its website. Surely USP knows best whether its methods are supposed to be the gold standard for dietary supplements. It says clearly on its website that they aren't. I see them over time. If I could just conclude by saying, I'd remind your honors, we're here on preemption. Preemption is an affirmative defense. It's not for us to show it's not preempted. It's for defendants to show that the case is. I would contend that they haven't met their burden here. You should reverse the district court. All right. Thank you both. Thank you, your honors. We will reserve this issue.